IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-79

No. 64A21

Filed 17 June 2022

STATE OF NORTH CAROLINA

v.

RILEY DAWSON CONNER

Appeal pursuant to N.C.G.S. § 7A-30(2) from a divided decision of the Court of Appeals, 275 N.C. App. 758 (2020), affirming in part, and vacating and remanding in part, judgments entered on 21 February 2019 by Judge Michael A. Stone in Superior Court, Columbus County. Heard in the Supreme Court on 10 November 2021.

*Joshua H. Stein, Attorney General, by Kimberly N. Callahan, Special Deputy Attorney General, for the State.*

*Glenn Gerding, Appellate Defender, by David W. Andrews, Assistant Appellate Defender, for defendant-appellant.*

*Disability Rights North Carolina, by Lisa Grafstein, Susan H. Pollitt, and Luke Woollard, for Center for Child and Family Health, National Association of Social Workers, including its North Carolina affiliate, and Disability Rights North Carolina, amici curiae.*

*Christopher J. Heaney, Emily A. Gibson, and Margaret P. Teich for North Carolina Advocates for Justice, amicus curiae.*

MORGAN, Justice.

¶ 1   The Supreme Court of the United States has determined that it is unconstitutional to sentence a juvenile defendant to a term of life without parole

without consideration of the juvenile's age and attendant circumstances, and that such a sentence is constitutionally impermissible for the majority of juvenile offenders—specifically those who, upon consideration of their age, the unique circumstances of their respective lives, and the nature of their charged crimes, have been excluded from the narrow category of juveniles who at the time of sentencing can be deemed to be permanently incorrigible or irredeemable. *See Montgomery v. Louisiana*, 577 U.S. 190, 195 (2016) (stating that "a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.' " (quoting *Miller v. Alabama*, 567 U.S. 460, 479–80 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005))). In the present case, this Court ponders a potential extension of this cited precedent as we consider whether a fifteen-year-old juvenile defendant's sentences of (1) 240 to 348 months of imprisonment for a conviction of rape and (2) life imprisonment with the possibility of parole for a conviction of murder, ordered by a trial court to run consecutively which will keep defendant incarcerated until the age of sixty years before having the opportunity to demonstrate that he should be allowed to be released on parole, combine to constitute a de facto sentence of life without parole in violation of the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution. This is a question of first impression for this Court, and the Supreme Court of the United States likewise has not yet explicitly addressed this specific

circumstance.[1]

A careful review of the pertinent case law, along with the relevant provisions of both the United States Constitution and the North Carolina Constitution, mandates our conclusion that juvenile offenders who have received sentences of life imprisonment with the possibility for parole, while not *guaranteed* parole at any point during their respective terms of incarceration, nonetheless must have the opportunity to seek an early release afforded by the prospect of parole after serving no more than forty years of incarceration.

## I. Factual background and procedural history[2]

### A. Defendant's childhood

From the time of his birth on 23 August 2000 through the date of 11 March 2016 when, at the age of fifteen years, defendant committed the crimes which led to the convictions underlying this appeal, the juvenile defendant's life was challenging, chaotic, and marked by tremendous instability. At the time that defendant was born,

---

[1] However, "after *Miller*, the Supreme Court in several cases involving aggregate crimes granted certiorari, vacated the sentence, and remanded for consideration in light of *Miller*." *State v. Null*, 836 N.W.2d 41, 73 (Iowa 2013) (collecting cases).

[2] The factual background which is provided here is based upon the record before this Court, drawn primarily from the transcripts generated by the entry of defendant's plea and the subsequent sentencing hearing. While the testimony in the record is occasionally inconsistent regarding certain dates and details about defendant's life and experiences, nonetheless efforts have been expended to organize the information in order to create a comprehensible narrative.

his father was twenty years of age, his mother was eighteen years of age,[3] and both parents were addicted to cocaine. Defendant's mother testified at defendant's trial that he began to experience severe sleep disruptions at one or two years of age which she later realized may have been signs of the epilepsy with which defendant was diagnosed as a teenager. Defendant initially lived with his parents on Miller Road in or near Tabor City in Columbus County. When defendant was around five years old, he moved into the home of his maternal grandparents on Savannah Road[4] along with his mother and his younger sister. Defendant's mother testified that during this time, because she was "strung out" on crack cocaine and "running the roads," her parents provided much of the care for her children. Defendant's father was incarcerated during this time period. Numerous members of defendant's extended family lived on Savannah Road and in the neighboring area, including defendant's grandparents, his great-grandmother, and several aunts and uncles. Despite the strong presence of his family members, the area in which defendant was raised was described by defendant's maternal aunt, Kimberly Gore, as "the pits of hell," and by defendant's mother as "nowhere for a child to be" because it was the location of illegal drug use and prostitution.

---

[3] At the time of defendant's sentencing hearing, his mother was divorced from his father, had remarried, and was known as Amanda McPaul.

[4] The record on appeal includes various references to this thoroughfare as Savannah Road, Savannah Extension Road, and Savannah Road Extension. In this opinion, the roadway will be referred to as Savannah Road for purposes of consistency.

¶ 4     Gore testified at defendant's trial about defendant's ongoing experience of being passed from home to home as he moved between and among a myriad of family members who served as formal and informal caretakers. In the words of Gore, defendant's "mother and father [were] constantly in and out of his life. They were not by [any] means anywhere close to being stable parents. They rejected [defendant] time and time again." At the age of four years, defendant witnessed the armed arrest of his father and uncle due to the men's possession of a truckload of marijuana, that constituted an event which a mitigation specialist later described as "one of the first really traumatic things that happened in [defendant's] life." According to defendant's mother, defendant eventually saw his father arrested "[m]ultiple times."

¶ 5     When defendant was five years old, both of his parents were arrested for larceny and other charges. Defendant's mother testified that defendant was "picked on" at school because defendant's peers knew that his parents were drug addicts. When defendant was six years old, his father was sentenced to a prison term of five years, and, although defendant's mother received a sentence of probation, her drug use prevented her from successfully completing her probation and she went to prison when defendant was seven years old. Gore noted that defendant's parents missed most of defendant's early birthday celebrations, and she recalled an incident in which defendant, at the age of seven years, ran "down the side of the highway screaming 'I hate you, I hate you'" as his mother drove away, leaving defendant behind.

¶ 6        At some point around 2005 or 2006, the Columbus County Department of Social Services (DSS) took custody of defendant and his infant sister after defendant reported to Gore that the two children had been taken to a strange structure, which turned out to be a crack house. Defendant's maternal grandparents formally received custody of defendant and his sister when defendant was about six years old. However, the maternal grandmother struggled to care for the children, and defendant frequently stayed with Gore on weekends. Gore testified that, during this time period, defendant experienced severe night terrors during which he would "not wake up." These episodes were accompanied by "outbursts, the flailing of his arms, the slinging, the beating, walking to one end of the house to the other," which was a behavioral pattern that defendant's mother testified had begun when defendant was one or two years old. A doctor who examined defendant when the juvenile was eight years old expressed concern that defendant might be experiencing effects of post-traumatic stress disorder, but defendant did not receive counseling or other treatment.

¶ 7        Also during the time that defendant was eight years of age, his maternal grandmother suffered a stroke. Defendant was then shuttled between the homes of his paternal grandmother and his mother on Savannah Road. Defendant apparently was often removed from the classroom while in elementary school, at times because he was being "picked on" and other times because he reacted violently to being teased in this way. Defendant consistently failed his end-of-grade tests in the third grade

and was held back in his school advancement in order to repeat the grade. At the age of nine years, defendant began to use marijuana. At age ten, defendant lived with his mother and stepfather away from Savannah Road for some period of time, but when defendant's father was released from prison during the following year, defendant returned to Savannah Road to live with his father and stepmother. Also residing on Savannah Road at the house belonging to defendant's great-grandmother was defendant's paternal aunt and the paternal aunt's son—consequently, defendant's cousin—Brad Adams, who was about ten to twelve years older than defendant. Adams both used and sold illegal drugs, sometimes supplying them to defendant. Occasionally, the paternal aunt took defendant to motels in the area while she worked there as a prostitute.

¶ 8     Defendant began drinking alcohol at the age of eleven years old, consuming multiple beers on an almost daily basis and sometimes to the point of unconsciousness. Also when he was eleven years old, defendant began using the controlled substance Xanax, ingesting up to eight pills at a time to get high. Defendant moved to Brunswick County at age twelve and started to become sexually active. Defendant failed his fifth-grade end-of-grade tests and potentially would have been required to repeat the grade, but he transferred to Nakina Middle School, where he was placed in the sixth grade. Defendant went to live with his father for a short period of time and transferred to a different school in another municipality, but

following his father's arrest for robbing a bank, defendant returned to live with his mother and stepfather on Savannah Road and transferred back to Nakina Middle School. But the institution would not assign defendant to a classroom because of his confrontations with other students, and defendant was eventually expelled from the school for disruptive behavior and bullying. Defendant then briefly attended an alternative school in Columbus County, followed by another alternative school in South Carolina. While enrolled in the South Carolina school, defendant was charged with the offense of assault for hitting a student in the head with a textbook. As a result, defendant was expelled from the school. When the charge was later dismissed, defendant was readmitted to the school as a sixth grader; however, defendant was soon expelled again from the institution after being adjudicated delinquent in juvenile court for simple possession of marijuana. Defendant's last official education records are from his sixth-grade year.

¶ 9 From this point forward with regard to defendant's education, defendant was supposed to be home schooled by his grandmother, but in actuality, defendant was a "free agent." He spent his days at an abandoned trailer on Savannah Road "to hang out and do drugs" with his older cousin Brad Adams. Family members testified at trial that defendant looked up to and "worship[p]ed" Adams, but they emphasized that the cousin was a very negative role model. Adams illegally sold heroin, methamphetamine, and "pills," all controlled substances, and regularly and illegally

provided drugs to defendant. At the age of thirteen years, defendant was diagnosed with frontal lobe epilepsy and received a secondary diagnosis of behavior problems, resulting in prescriptions for Klonopin and other seizure-related medications. Defendant expanded his illegal drug use as well; he began to use opiates at age thirteen and heroin at age fourteen. The next year, defendant received additional diagnoses of conduct disorder, cannabis use disorder, alcohol use disorder, sedative or hypnotic use disorder, and disruption of family.

¶ 10      In June 2015, when he was fourteen years old, defendant had a disagreement with Adams and Adams's mother, so defendant again left Savannah Road to reside with his mother and stepfather in South Carolina. Defendant subsequently drifted among his father, his father's ex-wife, and his stepsister and her boyfriend in his places of residence. Defendant's seizures increased in frequency at this juncture, numbering as many as six to ten per night, which led to a change in his medications. Around February 2016, defendant briefly moved to Florida to live with his father, and then returned to his mother's home for a short stint, but he ultimately returned to Savannah Road so that he could spend time with Adams and be largely unsupervised. On 22 February 2016, defendant's mother and stepfather took defendant to a doctor because defendant was continuing to withstand up to a dozen seizures on a nightly basis. By 25 February 2016, defendant's nocturnal epilepsy was getting progressively worse, so he went to another doctor who thought the seizures might be due to PTSD.

This physician changed defendant's medications yet again.

¶ 11         Five days later, in the early morning hours of 2 March 2016, defendant broke into and entered a local supermarket, stealing a large quantity of cigarettes. The business was equipped with an alarm system which alerted law enforcement to the break-in. At about 4:00 a.m., while officers were at the scene completing a report, one of the officers received word from Adams's mother that defendant had taken a van belonging to her. Security camera footage from the store into which defendant had broken and entered allowed officers to quickly identify defendant as the perpetrator. By the time officers arrived at Savannah Road to locate defendant, he and the van were unable to be found. At about 8:00 a.m., Adams's mother notified law enforcement that defendant had returned her vehicle. Shortly thereafter, officers stopped the van as it was being operated and discovered that Adams's mother was driving the vehicle, with defendant riding in the passenger seat. The officers also recovered the stolen cigarettes from the van.

¶ 12         Upon this development, law enforcement officers prepared a juvenile petition alleging that defendant was delinquent based on (1) breaking or entering, larceny after breaking or entering, and felony possession of stolen property after breaking into a store and stealing cigarettes in connection with the supermarket theft, and (2) larceny of a motor vehicle and possession of a stolen vehicle. The officers made arrangements for defendant to meet with a juvenile court counselor at 1:00 p.m. on

11 March 2016 and then departed in order to file the petition.

**B. Defendant's underlying offenses, statements to law enforcement officers and arrest**

¶ 13       Later on the day of 2 March 2016, defendant's aunt Felicia Porter called the emergency number 911 to report that defendant was involved in a scuffle inside the Savannah Road home of defendant's great-grandmother. Porter informed the 911 operator of defendant's juvenile petitions and expressed her belief that defendant "needs to get locked up." The audio recording of the 911 call captures an argument which occurred between defendant and Porter during that time.

¶ 14       According to the transcript of defendant's pleas of guilty which the trial court accepted in the underlying case, on the morning of 11 March 2016—the same date on which defendant had a scheduled 1:00 p.m. appointment with a juvenile court counselor in connection with his pending juvenile petition—defendant's aunt Felicia Porter awakened at about 6:00 a.m. and drove her husband to a nearby location where he was to be provided transportation to a construction job. Porter's social media posts on Facebook show that she was back at her home on Savannah Road and was active online by approximately 9:00 a.m. At about 9:30 a.m., defendant was observed by John Cunningham, his step-grandfather, walking toward the end of the road where Porter's home was located.

¶ 15       Defendant knocked on Porter's door and convinced her to exit the residence. Subsequently, defendant raped Porter and then killed her with blows from a shovel.

Defendant placed Porter's body in a wooded area about one hundred yards from her home and then burned a piece of Porter's clothing in her yard. Around 10:30 a.m. to 10:45 a.m., defendant left Porter's residence and walked by the side of the road, stopping to speak to Cunningham along the way. Cunningham noted that defendant was sweating profusely. Defendant attended his scheduled meeting with the juvenile court counselor later that day.

¶ 16    Meanwhile, defendant's great-grandmother, with whom defendant was dwelling at the time, became concerned when Porter did not answer repeated telephone calls. At approximately 12:00 p.m., Cunningham and Adams went to Porter's home to check on her and found the door to the residence ajar, Porter's dog secured inside the house, and Porter absent. After Cunningham contacted Porter's husband, a missing person's report was filed with authorities that afternoon. Porter's badly beaten body was found the next day about one hundred yards from her trailer. An autopsy revealed that Porter died as a result of blunt force trauma to the head which was later determined to have been caused by being repeatedly struck with a shovel.

¶ 17    Defendant was interviewed by law enforcement officers a total of four times in connection with Porter's death. In his first statement, given on 12 March 2016, defendant denied that he walked toward Porter's residence on the previous day of 11 March 2016, insisting that he had walked in the other direction and reporting that

he had seen a suspicious vehicle. After the interview, defendant went to stay with his mother and stepfather. On 16 March 2016, defendant's mother took him to a local hospital emergency room because defendant had begun to have as many as fifteen seizures per night, with some of them being "so severe that he [was] developing bruises along his elbows and shins." On 21 March 2016, defendant experienced his worst seizure ever, losing bowel and bladder control and foaming at the mouth. Defendant was transported to UNC Memorial Hospital where he had up to thirty seizures per night. An MRI of defendant's brain was positive for "mesial temporal sclerosis, which is like damage to the frontal lobe." He was diagnosed with "intractable frontal lobe epilepsy that is poorly controlled." A medical doctor at UNC reported, "This case is complicated by non-compliance of medication, lack of insight of his condition and severe oppositional behavior problem and agitation that often is due to the frequent partial epilepsy." Another doctor also found that the "partial seizures are associated with psychiatric agitation" and that significant behavioral changes "could well be due to uncontrolled frontal seizures." Yet another doctor commented that "frontal lobe epilepsy may affect a patient's ability to regulate his emotions and prevents a patient from getting adequate sleep." While defendant was at UNC Hospital, his mother physically assaulted him, which resulted in a complaint being filed with DSS. By the time that defendant was discharged from UNC Hospital after five days, the number of defendant's seizures had been reduced to seven a night.

DSS exercised its placement authority over defendant to house him with his stepsister and her boyfriend upon defendant's release from the hospital.

¶ 18         A few days later, on 29 March 2016, defendant gave three statements to law enforcement officers who were investigating Porter's murder. In his first statement on that date, defendant admitted walking in the direction of Porter's house on 11 March 2016—contrary to defendant's 12 March 2016 statement that he did not walk in the direction of Porter's residence but instead walked in the other direction—but claimed that he did so in order to check on a marijuana plant that defendant was growing in the woods. In a second interview which was requested by defendant himself on the same day of 29 March 2016, defendant represented that Adams had "been fronted a kilo of heroin" that was in the possession of Porter's husband Herb and that defendant had accompanied Adams to the Porter home in order to confront Herb. Defendant further claimed that when Adams discovered that only Porter was at the residence, Adams struck Porter with a brick, raped her, and then killed her. In his third interview of 29 March 2016, defendant admitted that his previous claim that his uncle "Herb" had been supplied heroin by Adams was false. Defendant still maintained, however, that Adams had raped and killed Porter, but at this stage introduced that he had also raped Porter and had helped Adams to carry Porter's

body to the woods where she was discovered.[5] Just after midnight on the early morning of 30 March 2016, defendant was arrested and charged with the rape and murder of his aunt Felicia Porter. Defendant experienced a violent seizure in the detention center and was taken to a hospital where he tested positive for the presence of marijuana and PCP in his system.

## C. Defendant's plea, sentencing, and appeal

¶ 19     On 18 February 2019, as part of an agreement with the State, defendant entered pleas of guilty to one charge of first-degree murder with premeditation and deliberation and one charge of first-degree rape in connection with the offenses which he committed as to the victim, his aunt Felicia Porter. In exchange for defendant's pleas, the State dismissed other charges against him, including felony breaking or entering, felony larceny after breaking or entering, two counts of felony possession of stolen goods, and felony larceny of a motor vehicle, all of which charges arose from defendant's theft of a van from Adams's mother and theft of cigarettes from a local supermarket nine days before the rape and murder. Defendant filed a motion seeking to have the trial court to declare that both the imposition of a sentence of life without parole and the sentencing directive found in N.C.G.S. § 15A-1340.19A would be

---

[5] Forensic analyses of the rape kit conducted on Porter revealed that defendant was the major contributor of DNA and excluded Adams as a perpetrator of rape. No other evidence linked Adams to the rape and murder of Porter. It is unclear from the record on appeal at what point defendant admitted, for the factual basis of his guilty plea, that he alone had raped and killed Porter.

unconstitutional as applied to him. At the conclusion of the State's recitation of the factual basis for defendant's pleas, the trial court denied defendant's motion and moved to the sentencing phase of the proceedings which took place over a period of four days. In addition to documentary evidence and testimony received from defendant's mother, one of defendant's aunts, the husband of defendant's stepsister, and a mitigation specialist—who all testified to the circumstances of defendant's life before his arrest for Porter's rape and murder as described above, defendant also offered testimony from a forensic psychologist who described, *inter alia*, defendant's low intelligence quotient score, defendant's acceptance of responsibility for his crimes, and improvements in defendant's behavior during his incarceration. This expert witness also opined that defendant's development and rehabilitation would likely be negatively affected by the imposition of a sentence upon defendant which would deny the juvenile any opportunity for eventual release.

¶ 20        Following the completion of defendant's sentencing hearing on 21 February 2019, the trial court found the existence of nineteen statutory and non-statutory mitigating factors in defendant's case. Specifically, the trial court found that at the time of the offenses:

> • defendant was fifteen years and six months old;
>
> • defendant "exhibited numerous signs of developmental immaturity. . . . exacerbated by low levels of structure, supervision, and discipline";

• defendant's father was incarcerated for most of defendant's life and his mother struggled with substance abuse and incarceration and "has not been present for the vast majority of defendant's life";

• defendant "has been passed to one family member to another for basic living and custodial purposes and never received any parental leadership, guidance, or structure";

• defendant "suffers from chronic frontal lobe epilepsy which went untreated for years causing daily seizures" which then caused "brain injury" and "chronic sleep deprivation";

• defendant was subjected "in his transient living conditions to criminal activity, violence, and rampant substance abuse," with his own substance abuse starting "at approximately age nine";

• defendant's "only role model was a negative role model, Brad Adams, an individual with a horrible criminal history and habitual felon. . . . defendant looked up to Brad Adams, who was ten years senior to [ ] defendant in age";

• defendant "had a limited ability to fully appreciate the risks and consequences of his conduct based upon the totality of his poor upbringing";

• defendant's "I.Q. and educational levels appear at the low range of average to below average";

• defendant "is a record level I for sentencing purposes";

• defendant "was subjected to an overall environment of drugs and other criminal activity";

• defendant, "[b]ased upon testing and other professional evaluations, . . . would benefit from education, counseling, and substance abuse treatment while in confinement and incarceration";

· defendant at age four years "witnessed a drug raid at his home resulting in the arrest of his father and his uncle," after which he "started to experience night terrors";

· defendant at age six years "was removed from his parents' home due to the drug abuse in the home";

· defendant's grandmother reported he "had always been affected by such nightmares and night terrors and that he would awaken three or four times a night with what is now purported to be seizures"; and

· defendant "has recently demonstrated some increased maturity while being incarcerated, and [ ] he did agree to enter this plea [on 18 February 2019]."

¶ 21   The trial court concluded that "the evidence supports the statutory criteria [stated in N.C.G.S. § 15A-1340.19B(c)] and those contained in *Miller vs. Alabama.*"[6] (Italics added.) The trial court then sentenced defendant to life imprisonment with the possibility of parole after twenty-five years for the murder.[7] Defendant also received a sentence of 240 to 348 months for first-degree rape, which is the maximum sentence in the presumptive range for the commission of the offense of first-degree rape in light of defendant's prior record level of I pursuant to N.C.G.S. § 15A-

---

[6] In *Miller* the Supreme Court of the United States held that the imposition of a mandatory life sentence without the possibility of parole for a juvenile defendant is unconstitutional. 567 U.S. at 479. N.C.G.S. § 15A-1340.19B is part of a statutory framework enacted in response to *Miller* which sets forth procedures for determining whether a juvenile offender "should be sentenced to life imprisonment without parole, as set forth in G.S. 14-17, or a lesser sentence of life imprisonment with parole." N.C.G.S. § 15A-1340.19B(a)(2) (2019).

[7] Under the North Carolina General Statutes, eligibility for parole for defendants convicted of murder who were juveniles at the time of the offense begins after twenty-five years of imprisonment. *Id.* § 15A-1340.19A.

1340.17(c) (2019). The trial court ordered that defendant's first-degree murder sentence of life imprisonment with the possibility of parole and sentence for first-degree rape of 240 to 348 months run consecutively, giving an aggregate minimum sentence of forty-five years before defendant could seek parole. Defendant would be sixty years of age at the time that he first became eligible to be considered for parole. The trial court overruled defense counsel's objection in which counsel argued that the imposition of the two consecutive sentences constituted a de facto life without parole sentence in violation of the Constitution of the United States and the Constitution of North Carolina.

Defendant appealed to the North Carolina Court of Appeals, bringing forward three arguments: that (1) N.C.G.S. §§ 15A-1340.19A to -1340.19D (commonly known as North Carolina's "*Miller*-fix statutes"[8]) prohibit the consecutive sentences imposed by the trial court here; (2) the two consecutive sentences imposed on defendant are the functional equivalent of a sentence of life without parole and are therefore unconstitutional under the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution when imposed on a juvenile who is not determined by the trial court to be incorrigible or irredeemable; and (3)

---

[8] The so-called "*Miller*-fix statutes" are laws which were expeditiously enacted by the General Assembly in the wake of the decision issued by the Supreme Court of the United States in *Miller v. Alabama*. These enactments constituted North Carolina's effort to conform this state's juvenile sentencing laws to the mandates of *Miller*.

the trial court's imposition of lifetime satellite-based monitoring without a hearing was error. *State v. Conner*, 275 N.C. App. 758, 759 (2020). All three judges comprising the appellate court panel agreed that the trial court's order imposing lifetime satellite-based monitoring on defendant must be vacated and remanded "for a hearing on the matter that complies with the statutory procedure in N.C.[G.S.] § 14-208.40A." *Id.* at 760.

¶ 23    In reviewing the consecutive sentences which the trial court ordered defendant to serve, the entire panel also agreed that the *Miller*-fix statutes do not flatly prohibit consecutive sentences, while unanimously recognizing as well that other sentencing provisions which are generally applicable give trial courts the discretionary authority to decide whether multiple sentences should run concurrently or consecutively. *Id.* at 759 (majority opinion) (citing N.C.G.S. § 15A-1340.19A (2019) (stating that "a defendant who is convicted of first[-]degree murder, and who was under the age of 18 at the time of the offense, shall be sentenced in accordance with this Part") and N.C.G.S. § 15A-1354(a) (2019) (stating that "[w]hen multiple sentences of imprisonment are imposed on a person at the same time . . . the sentences may run either concurrently or consecutively, as determined by the [trial] court")); *id.* at 760 (McGee, C.J., concurring in part and dissenting in part).

¶ 24    In contrast, on the question of whether defendant's consecutive sentences here constitute the functional equivalent of a life sentence without the possibility of parole

and are therefore unconstitutional, the Court of Appeals panel divided. The majority correctly observed that "*Miller* has never held as being unconstitutional a life *with* parole sentence imposed on a defendant who commits a murder when he was a minor" and assumed "that a *de facto* [life without parole] sentence (where a defendant is sentenced to consecutive terms for multiple felonies) is unconstitutional," but went on to conclude that

> [d]efendant will be eligible for parole when he is 60 years old. . . . [and held] that based on the evidence before the trial court a 45-year sentence imposed on this 15-year old does not equate to a *de facto* life sentence. Our General Statutes recognize that the life expectancy for a 15-year old is 61.7 years. N.C.[G.S.] § 8-46 (2019).

*Id.* at 760 (majority opinion). In reaching this result, the majority acknowledged that another panel of the Court of Appeals had "recently held an identical sentence unconstitutional on these grounds in *State v. Kelliher*, [273 N.C. App. 616] (2020)." The majority noted that this Court has stayed the operative effect of, and granted discretionary review in, the *Kelliher* decision. *See* 376 N.C. 900 (2021). The majority thus observed that *Kelliher* is not binding on the panels of the Court of Appeals. *Conner*, 275 N.C. App. at 760.

¶ 25        The author of the Court of Appeals majority decision in *Kelliher* served as the dissenting judge in the lower appellate court's decision in the present case regarding the issue of whether defendant's consecutive sentences constituted an unconstitutional de facto life sentence in violation of the Eighth Amendment to the

Constitution of the United States and article I, section 27 of the Constitution of North Carolina, citing, *inter alia*, *Kelliher*. *Id.* at 760 (McGee, C.J., dissenting in part). First, the dissent in this case acknowledged the obvious interplay between N.C.G.S. § 15A-1354 and the *Miller*-fix statutes in the sentencing of juvenile offenders, *id.* at 771–73. The dissent then cited our canon of statutory construction that "if 'there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, *the two should be read together and harmonized.*' " *Id.* at 771–72 (quoting *LexisNexis Risk Data Mgmt., Inc. v. N.C. Admin. Off. of the Cts.*, 368 N.C. 180, 186 (2015) (emphasis added)). In undertaking the dictate to harmonize the two relevant statutes, the dissent employed the same starting point as the majority in rejecting defendant's appellate argument that the relevant statutory language "compels sentences with [parole] eligibility at 25 years," *id.* at 771, because "the holding requested by [d]efendant—that the definition of 'life imprisonment with parole' compels sentences allowing for parole eligibility *at* 25 years—would impermissibly deviate from the unambiguous statutory language [of N.C.G.S. § 15A-1354 which permits sentences to be set to run either consecutively or concurrently]," *id.* at 772 (citing *State v. Jackson*, 353 N.C. 495, 501 (2001) ("When the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and

limitations not contained therein.") (quoting *In re Banks*, 295 N.C. 236, 239 (1978)).

¶ 26        In applying its statutory analysis and reconciliation of the laws at issue, the dissent would have granted relief to defendant based upon his constitutional argument that the consecutive sentences imposed in his particular case constituted an unconstitutional de facto sentence of life in prison without parole. In addition to reviewing the content and intent of the line of United States Supreme Court cases preceding, including, and following *Miller*, in conjunction with a rejection of the majority's application of "the statutory mortality table found in N.C.[G.S.] § 8-46," *id.* at 780, the dissent would hold that defendant's sentence of "a minimum of 45 years [with an] earliest possible release at age 60 still presents a *de facto* LWOP sentence" in violation of both the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution, *id.* at 775.

¶ 27        With more specific regard to the dissenting view's disagreement with the majority's usage of the statutory mortality table found in N.C.G.S. § 8-46 to sanction the forty-five-year period of incarceration which defendant would be required to complete before having the opportunity to seek parole, the dissent stated that the

> statute by its very terms provides that it "*shall* be received
> . . . *with other evidence as to the health, constitution and
> habits of the person*[.]" (emphasis added). Thus, the life
> expectancy "table . . . is not conclusive, but only
> evidentiary," *Young v. E. A. Wood & Co.*, 196 N.C. 435, 437
> . . . (1929) (construing a predecessor statute), and "life
> expectancy is determined from evidence of the plaintiff's
> health, constitution, habits, and the like, *as well as* from

> [the statutory] mortuary tables." *Wooten v. Warren by Gilmer*, 117 N.C. App. 350, 259 [sic] . . . (emphasis added) (citation omitted). The 61.7 year life expectancy for 15-year-old minors found in the statute certainly [is] not conclusive in light of [d]efendant's "health, constitution, habits, and the like." *Id.* For example—and setting aside any impact that a minimum of 45 years of imprisonment will have on [d]efendant—it is uncontroverted that [d]efendant suffers from mesial temporal sclerosis, epilepsy, PTSD, has a history of head injuries dating back to infancy, and years-long history of heavy, and varied drug abuse dating back to age eleven. The statutory life expectancy and mortality table *requires* consideration of this evidence alongside the tables themselves, N.C.[G.S.] § 8-46, and the majority's reliance on the lone 61.7 number provided by the statute does not change the "reality" of [d]efendant's punishment. *Cf. Graham*, 560 U.S. at 70-71. . . .

*Id.* at 780. Though offering this perspective, the dissent did not endeavor to propose any specific example or determination of a constitutionally permissible sentence for defendant in this matter.

On 4 February 2021, defendant filed a notice of appeal based upon the dissenting opinion. The standard of review employed by this Court as to constitutional arguments presented here is a de novo standard, without deference to the lower court decisions. *See, e.g.*, *State v. Williams*, 362 N.C. 628, 632–33 (2008).

## II.    Analysis

## A.  Precedent and principles regarding sentences for juvenile defendants

Upon defendant's appeal, the question before this Court can be parsed into two subsidiary issues: (1) whether consecutive sentences which arguably act as a de facto

life sentence violate the Eighth Amendment to the United States Constitution and article I, section 27 of the North Carolina Constitution when imposed upon a juvenile defendant when the sentencing court has not determined that the juvenile defendant is incorrigible and irredeemable, and (2) if so, whether the specific sentences as imposed in this case constitute an unconstitutional de facto life without parole sentence for this individual juvenile defendant.

**1. The evolution of juvenile sentencing under the Eighth Amendment to the Constitution of the United States**

¶ 30        Eighth Amendment jurisprudence regarding sentencing for juvenile defendants has been a fertile ground for change over the past several decades as the Supreme Court of the United States, lower federal courts, and the appellate courts of North Carolina have been consistently beckoned to consider and address the continually evolving societal view of juveniles in the criminal justice system as well as the ongoing discoveries via scientific research regarding the special vulnerabilities and developmental malleability of youthful offenders. The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments" for any person. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). Because "cruel and unusual punishments" are not precisely defined in the Eighth Amendment, courts have long been called upon to furnish guideposts for determining the punitive limits imposed by this constitutional provision.

¶ 31       One central guideline characterizing general Eighth Amendment analysis has been consideration of the proportionality of a sentence to the circumstances that the sentence addresses; that is, whether a particular sentence is so excessive, either with regard to the offense or the perpetrator, that it offends the Constitution. A punishment can be found to be disproportionate based upon a comparison between an individual defendant's crime and his sentence. *See, e.g., Harmelin v. Michigan,* 501 U.S. 957 (1991) (considering and then affirming a mandatory life-without-parole term for cocaine possession). Moreover, the unconstitutionality of a sentence may be determined based upon the "nature of [the] offense" or upon specific characteristics of an entire class of offenders in connection with their sentences. *See, e.g., Atkins v. Virginia,* 536 U.S. 304 (2002) (holding that the execution of offenders who were developmentally disabled constituted cruel and unusual punishments in violation of the Eighth Amendment). In *Atkins* the Court stated that it had reached this conclusion as a result of its focus upon the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Id.* at 311 (alteration in original) (quoting *Weems v. United States,* 217 U.S. 349, 367 (1910)). Three years later in *Roper,* the Court further noted that

> [t]he prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the

> propriety and affirmed the necessity of referring to "the
> evolving standards of decency that mark the progress of a
> maturing society" to determine which punishments are so
> disproportionate as to be cruel and unusual.

*Roper*, 543 N.C. at 560–61 (citing *Trop v. Dulles*, 356 U.S. 86, 100–101 (1958)
(plurality opinion)).

¶ 32        Having identified this framework for purposes of Eighth Amendment analysis

in the instant case, we recognize that a distinct proportionality analysis has been

applied to another class of defendants: offenders who were juveniles at the time that

they committed their respective crimes. When examining the sentencing of juvenile

defendants in the crucible of the Eighth Amendment, we begin with a brief review of

the pertinent precedent existing at the time of defendant's sentencing hearing,

including—in sequential order of their issuance—the opinions in *Roper*, *Graham v.

Florida*, *Miller*, and *Montgomery*.

¶ 33        In *Roper v. Simmons*, the Supreme Court of the United States considered

whether the Eighth Amendment "bars capital punishment for juvenile offenders,"

specifically those defendants who were "older than 15 but younger than 18 years" of

age at the time that they committed the underlying offenses. 543 U.S. at 555–56. The

high Court considered a number of relevant factors, including the lack of a "national

consensus in favor of capital punishment for juveniles," *id.* at 567, and observed that

"the death penalty is reserved for a narrow category of crimes and offenders," the

worst and most culpable offenders, *id.* at 569. The Supreme Court then described

three general differences between juveniles and adults:

> First, as any parent knows and as the scientific and sociological studies . . . tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. . . .
>
> The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. . . .
>
> The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed.

*Id.* at 569–70 (extraneity omitted). Consequently, the highest legal forum opined that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Id.* at 570. Accordingly, the Supreme Court held that the imposition of a death sentence for an offender who was under the age of eighteen years at the time that the juvenile perpetrated the crime is unconstitutional. *Id.* at 578.

¶ 34 Subsequently, in *Graham v. Florida*, the United States Supreme Court considered "whether the Constitution permits a juvenile offender to be sentenced to life in prison without parole for a nonhomicide crime." 560 U.S. 48, 52–53 (2010). In an analysis similar to the scrutiny utilized in *Roper*, the eminent Court remarked that the practice of sentencing a juvenile who did not commit a homicide offense to a

term of life in prison without the possibility of parole was exceedingly rare, that a

national community consensus had developed against such sentences, and that none

of the generally recognized goals of sentencing, such as retribution, deterrence,

incapacitation, and rehabilitation, could justify imposition of a sentence of life

without the possibility of parole for a juvenile offender. *Id.* at 62–67. Beyond these

considerations, the Court also observed that

> [l]ife without parole is an especially harsh
> punishment for a juvenile. Under this sentence a juvenile
> offender will on average serve more years and a greater
> percentage of his life in prison than an adult offender. A
> 16-year-old and a 75-year-old each sentenced to life
> without parole receive the same punishment in name only.

*Id.* at 70 (citations omitted). Because a juvenile defendant's potential future danger

to society and the youngster's ability to be rehabilitated for the rest of his life cannot

be meaningfully evaluated at sentencing, a judgment of life without parole denies a

juvenile offender the chance to demonstrate his growth, maturity, and rehabilitation.

*Id.* at 75. Thus, the Supreme Court held that "[t]he Constitution prohibits the

imposition of a life without parole sentence on a juvenile offender who did not commit

homicide. . . . [and] if [a trial court] imposes a sentence of life it must provide him or

her with some realistic opportunity to obtain release before the end of that term." *Id.*

at 82.

¶ 35        Two years after its issuance of *Graham*, the Supreme Court of the United

States reviewed in *Miller v. Alabama* the constitutionality of mandatory life without

the possibility of parole sentences for juveniles who committed murder. *Miller*, 567

U.S. at 465. The defendants in *Miller* were two fourteen-year-old juveniles who were

"sentenced to life imprisonment without the possibility of parole. . . . [where] the

sentencing authority [did not] have any discretion to impose a different punishment."

*Id.* The defendant Miller

> was 14 years old at the time of his crime [and] had by then
> been in and out of foster care because his mother suffered
> from alcoholism and drug addiction and his stepfather
> abused him. Miller . . . regularly used drugs and alcohol;
> and he had attempted suicide four times, the first when he
> was six years old.

*Id.* at 467. In deciding *Miller*, the eminent tribunal first revisited the analysis and

reasoning which it had applied in *Roper* and *Graham*, viewing the "[t]reat[ment] [of]

juvenile life sentences as analogous to capital punishment." *Id. at* 475 (alterations in

original) (quoting *Graham*, 560 U.S. at 89 (Roberts, C.J., concurring in judgment)).

The Court then, in turn, harmonized this chain of juvenile law precedent with the

series of case law decisions which emphasize that death sentences must be imposed

only after consideration of the facts and circumstances of each individual case, *see,*

*e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion),

including the requirement that "a sentencer in a capital case must be allowed to

consider the 'mitigating qualities of youth." *Johnson v. Texas*, 509 U.S. 350, 367

(1993). The Court ultimately held in *Miller* that the Eighth Amendment bars the

automatic, mandatory imposition of a sentence of life without the possibility of parole

for juvenile offenders, forecasting while simultaneously instructing that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," even when a juvenile has committed a homicide offense. *Miller*, 567 U.S. at 479–80.[9]

¶ 36          In response to the decision in *Miller*, the General Assembly enacted statutes that were intended to adapt North Carolina's juvenile sentencing guidelines to the United States Supreme Court's directives in *Miller*. *See State v. James*, 371 N.C. 77, 78 (2018); *see, e.g.*, N.C.G.S. § 15A-1340.19A ("Notwithstanding the provisions of G.S. 14-17, a defendant who is convicted of first[-]degree murder, and who was under the age of 18 at the time of the offense, shall be sentenced in accordance with this Part."). These so-called *Miller*-fix statutes provide, *inter alia*, that juvenile defendants who are convicted of first-degree murder solely by virtue of the felony murder rule[10] can

---

[9] Four years after *Miller*, the Supreme Court in *Montgomery* confirmed that its holding in *Miller* "announced a substantive rule of constitutional law" which applied retroactively and therefore could be raised by juvenile defendants in a post-conviction posture. 577 U.S. at 212. In so deciding, the Court in *Montgomery* reiterated that its decision in "*Miller* required that sentencing courts consider a child's 'diminished culpability and heightened capacity for change' before condemning him or her to die in prison," because "a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect 'irreparable corruption.' " *Id.* at 195. Because defendant here is challenging his initial sentence on direct appeal rather than bringing forward an argument arising from a post-conviction proceeding, making *Montgomery* not directly relevant to this defendant's appeal, nonetheless the language and reasoning of *Montgomery* informs our understanding of the *Roper*, *Graham*, and *Miller* line of cases as they may assist our resolution of the present case.

[10] The felony murder rule affords the opportunity for the prosecuting government to charge a criminal defendant with murder in the event that the unlawful killing of an individual with whose murder the defendant is charged happened to occur during the defendant's commission of another felony offense.

only be sentenced to life in prison with the possibility of parole, N.C.G.S. § 15A-1340.19B(a)(1) (2019), and that in other circumstances where a sentence of life in prison without the possibility of parole would be available under the general sentencing provisions found in N.C.G.S. § 14-17, the trial court must conduct a sentencing hearing, *id.* § 15A-1340.19B(a)(2), (b) (2019). At the hearing, the juvenile defendant can present mitigation evidence on a number of factors:

> (1) Age at the time of the offense.
>
> (2) Immaturity.
>
> (3) Ability to appreciate the risks and consequences of the conduct.
>
> (4) Intellectual capacity.
>
> (5) Prior record.
>
> (6) Mental health.
>
> (7) Familial or peer pressure exerted upon the defendant.
>
> (8) Likelihood that the defendant would benefit from rehabilitation in confinement.
>
> (9) Any other mitigating factor or circumstance.

*Id.* § 15A-1340.19B(c) (2019). The sentencing court must then

> consider any mitigating factors in determining whether, based upon all the circumstances of the offense and the particular circumstances of the defendant, the defendant should be sentenced to life imprisonment with parole instead of life imprisonment without parole. The order adjudging the sentence shall include findings on the

> absence or presence of any mitigating factors and such
> other findings as the court deems appropriate to include in
> the order.

*Id.* § 15A-1340.19C(a) (2019).

The juvenile defendant's sentencing hearing in the current case occurred under the provisions of the *Miller*-fix statutes between the dates of 18 and 21 February 2019.[11] At his sentencing hearing, defendant argued that he was neither an incorrigible nor an irredeemable juvenile, and thus a sentence for him of life imprisonment without the possibility of parole was constitutionally impermissible. As noted above, the sentencing court agreed with defendant. The trial court entered findings of fact concerning the existence of numerous mitigating factors, and in its discretion, the trial court concluded that it would not sentence this juvenile defendant to a term of incarceration of life in prison without the possibility of parole. In this regard, the sentencing court acted in apparent conformity with *Miller* and all related appellate case law precedent.

Defendant's primary appellate argument concerns a question not yet directly addressed by the Supreme Court of the United States or by this Court: whether the effect of the imposition of active consecutive sentences of incarceration, each of which includes the possibility of parole, can be construed to operate to constitute a de facto

---

[11] Although defendant raised a challenge to the constitutionality of these provisions in his presentation to the Court of Appeals, the entire appellate court panel rejected his argument; therefore, that issue is not before this Court on appeal.

sentence of life imprisonment without any meaningful opportunity to seek parole. As viewed in this particular case, where a sentencing court (1) found that a juvenile offender was not incorrigible and irredeemable, and (2) thereby imposed multiple sentences, each of which offers defendant an opportunity for parole, but (3) the sentences are decreed by the sentencing court to run consecutively so as to afford defendant the opportunity to seek parole only after defendant has served a minimum of forty-five years of incarceration, should the trial court be legally considered to have rendered a sentence of life imprisonment without the possibility of parole to the juvenile defendant in violation of constitutional protections?

¶ 39    After the imposition of defendant's consecutive sentences in this case and while his appeal was pending in this Court, the United States Supreme Court issued another opinion for addition to the *Roper-Graham-Miller-Montgomery* string of cases. In *Jones v. Mississippi*, the juvenile defendant contended that the sentencer must, in addition to acknowledging that a life without parole sentence cannot be mandatory but is instead discretionary for the sentencing authority when a sentence of life *without* the possibility of parole is imposed upon a juvenile offender, "make a separate factual finding that the defendant is permanently incorrigible, or at least provide an on-the-record sentencing explanation with an implicit finding that the defendant is permanently incorrigible." 141 S. Ct. 1307, 1311 (2021). The high court rejected this position on the basis that

> [i]n *Miller*, the Court mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. And in *Montgomery v. Louisiana,* which held that *Miller* applies retroactively on collateral review, the Court flatly stated that "*Miller* did not impose a formal factfinding requirement" and added that "a finding of fact regarding a child's incorrigibility . . . is not required."

*Id.* (alteration in original) (citations omitted). In so stating, the Supreme Court attempted to provide direction that, under its precedent, sentencing courts are not required to make any specific finding regarding a juvenile's incorrigibility before imposing a life without parole sentence upon the juvenile, nor do they need to otherwise explain or justify the imposition of this most extreme of all sentences. *Id.* at 1313. Instead, the highest forum instructed that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.*

¶ 40        In addition to concluding that "[t]he resentencing in Jones's case complied with [the Court's] precedents because the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth," the United States Supreme Court explained that the appeal in *Jones* did "not properly present— and thus [the Court did] not consider—any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence." *Id.* at 1322. Finally, the Supreme

Court recapitulated that

> like *Miller* and *Montgomery*, our holding today does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder. States may categorically prohibit life without parole for all offenders under 18. Or States may require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole. Or States may direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth. States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences. All of those options, and others, remain available to the States. Indeed, many States have recently adopted one or more of those reforms. But the U.S. Constitution, as this Court's precedents have interpreted it, does not demand those particular policy approaches.

*Id.* at 1323 (citations omitted).

Hence, in review, the current state of federal constitutional law regarding the imposition of the harshest sentences for juvenile offenders convicted of criminal offenses can be summarized as follows: (1) juvenile offenders may not be subject to the death penalty under any circumstances; (2) juvenile offenders may not be subject to mandatory life sentences without the possibility of parole; (3) state laws establishing juvenile sentencing parameters must, at a minimum, provide discretion to the sentencing authority to impose a lesser sentence than life without parole for juvenile offenders; (4) Supreme Court of the United States case precedent does not require a sentencing authority to make a specific finding that a juvenile offender is

incorrigible before the sentencer exercises its discretion to impose a sentence of life without parole; (5) individual states are free to create additional limits and requirements regarding the sentencing of juvenile offenders; and (6) North Carolina's *Miller*-fix statutes, under which defendant here was sentenced, facially conform to the federal constitutional case law. While the federal constitutional law has continually been developed as the Supreme Court has robustly unfurled this burgeoning area of juvenile law through its opinions, nonetheless, the nation's highest court has not expressly spoken on the particular question which we now address.

**2. Claims under the North Carolina Constitution**

¶ 42    In addition to defendant's contentions that his consecutive sentences constitute a violation of the Eighth Amendment to the Constitution of the United States as interpreted in the opinions of the Supreme Court of North Carolina governing terms of life imprisonment for juvenile offenders, defendant also argues that his sentences contravene article I, section 27 of the Constitution of North Carolina.[12] This portion of the state's constitution establishes: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted." N.C. Const. Art. I, § 27. Article I, section 27 is nearly identical to the Eighth

---

[12] We fully adopt here the state constitutional analysis employed in *State v. Kelliher*, 2022-NCSC-77, the companion case which this Court contemporaneously decides with the present one.

Amendment with one difference in phraseology that bears some measure of significance. The two constitutional provisions diverge in their employment of different conjunctions in their final respective passages, with the United States Constitution prohibiting "cruel *and* unusual punishments" while the North Carolina Constitution bars "cruel *or* unusual punishments."

¶ 43        Applying the canons of construction, this apparent minor distinction in the terminology used in the two constitutional provisions is deceptively important. The use of the disjunctive "or" in article I, section 27 of the North Carolina Constitution's reference to "cruel *or* unusual punishments" plainly indicates that either of the two joined conditions is sufficient to invoke the stated prohibition. *See Routten v. Routten*, 374 N.C. 571, 575–76 (opining that "the disjunctive term 'or' in N.C.G.S. § 50-13.5(i) establishes that either of the circumstances is sufficient to justify the trial judge's decision to deny visitation" (citation omitted)), *cert. denied*, 141 S. Ct. 958 (2020); *see also Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 519 (2004) (noting "that the natural and ordinary meaning of the disjunctive 'or' permits compliance with either condition"). Thus, the language of article I, section 27 indicates that the state constitutional provision abrogates a range of sentences which is inherently more extensive in number by virtue of the provision's disjunctive term "or" than the lesser amount of sentences prohibited by the federal constitutional amendment due to its conjunctive term "and." On its face, the Constitution of North Carolina appears to

offer criminal defendants—such as juvenile offenders—more protection against extreme punishments than the Federal Constitution's Eighth Amendment, because the Federal Constitution requires two elements of the punishment to be present for the punishment to be declared unconstitutional ("cruel *and* unusual"), while the state constitution only requires one of the two elements ("cruel *or* unusual").[13]

¶ 44        Upon further considering the construction of the constitutional phrases under examination, and with particular attention upon the individual term "cruel" and the individual term "unusual," we have acknowledged that

> this Court historically has analyzed cruel and/or unusual punishment claims by criminal defendants the same under both the federal and state Constitutions. As the [United States] Supreme Court stated in *Trop v. Dulles*, 356 U.S. 86, 2 L. Ed. 2d 630 (1958):
>
>> Whether the word "unusual" has any qualitative meaning different from "cruel" is not clear. On the few occasions this Court has had to consider the meaning of the phrase, precise distinctions between cruelty and unusualness do not seem to have been drawn. These cases indicate that the Court simply examines the particular punishment involved in light of the basic prohibition against inhuman treatment, without regard to any subtleties of meaning that might be latent in the word "unusual."

---

[13] It is unsurprising that the literal terminology of the North Carolina Constitution offers greater protections than the United States Constitution does. *See* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 37 (2d ed. 2013) (commenting that the provisions contained in Article I "empower the state courts to provide protections going even beyond those secured by the U.S. Constitution").

> *Id.* at 100 n.32, 2 L. Ed. 2d at 642 n. 32 (citations omitted).
> Thus, we examine each of defendant's contentions in light
> of the general principles enunciated by this Court and the
> Supreme Court guiding cruel and unusual punishment
> analysis.

*State v. Green*, 348 N.C. 588, 603 (1998) (citations omitted), *cert. denied*, 525 U.S.

1111 (1999).[14]

Given the absolute bar on mandatory life in prison without the possibility of parole sentences as presumptively disproportionate for juvenile offenders—which legitimately implicates concerns about such punishments being "cruel"—coupled with the emphasis which the Supreme Court of North Carolina has placed on the presumed rarity with which life without parole sentences may constitutionally be imposed upon juvenile offenders—which would reasonably invoke apprehension about such punishments being "unusual"—the blurred differentiations as discussed

---

[14] In *Green* this Court considered, *inter alia*, "whether the sentencing of a thirteen-year-old . . . to a mandatory term of life imprisonment for first-degree sexual offense constitutes cruel and unusual punishment." 348 N.C. at 592. The defendant brought his challenge under applicable provisions of both the United States and North Carolina Constitutions. *Id.* at 602. In affirming the defendant's mandatory life without parole sentence, this Court opined in *Green* that "defendant's punishment in this case indicates it clearly comports with the 'evolving standards of decency' in society." *Id.* at 605. However, our decision in *Green* preceded the United States Supreme Court decisions in *Roper*, *Graham*, *Miller*, and *Montgomery*; consequently, the view of juvenile offenders exemplified in *Green* is in direct conflict with subsequent research and with our nation's evolution in its understanding of the culpability of juvenile offenders. Furthermore, the primary holding of *Green* does not comport with current precedent. While *Green* offers guidance on the meaning of the terms "cruel" and "unusual" as this Court has examined them individually and collectively, the case itself is no longer substantively applicable to the issue of mandatory life without parole sentences for juvenile offenders.

in *Green* between a cruel sentence and an unusual sentence for a juvenile offender remain relevant under the *Miller* progeny of cases. Consistent with this durable view, we do not need to untangle the nuances of any distinctions between the protections against "cruel *and* unusual punishments" offered by the Eighth Amendment to the United States Constitution and the protections against "cruel *or* unusual punishments" offered by the North Carolina Constitution. The trial court here determined that defendant was not to be included in the "exceedingly rare" category of juvenile offenders who are incorrigible or irredeemable, and therefore, defendant could not be sentenced constitutionally to a term of life in prison without the possibility of parole even under the arguably lesser protections of the Eighth Amendment. Upon this premise, the implementation of a sentence of life without parole for defendant is a violation under the even more protective provisions of article I, section 27 of the Constitution of North Carolina.

**B. De facto life sentences for purposes of juvenile sentencing**

¶ 46        As we have discussed above, a juvenile offender such as defendant who has been expressly excluded by the sentencer from the rare group of juvenile offenders who can be considered incorrigible and permanently irredeemable at the time of sentencing *may not* be sentenced to a term of life in prison without the possibility of parole. As we also discussed earlier, the imposition of a sentence of life with the possibility of parole upon a juvenile offender such as defendant who has been

convicted of first-degree murder on a legal principal other than the felony murder rule *is* constitutionally permissible. We are challenged to preserve these established sentencing parameters for juvenile offenders while adding the formidable complexity of the manner in which we should evaluate consecutive sentences that only allow the fruition of a defendant's initial parole eligibility after a lengthy term of incarceration in prison and at a point when a defendant is at an advanced age. In defendant's case, upon his receipt at the age of fifteen years of the two consecutive sentences imposed here, he will first become eligible to be considered for parole when he is sixty years old.

¶ 47     For juvenile offenders in North Carolina, a life sentence with the possibility of parole permits this category of young perpetrators to seek parole upon the completion of twenty-five years in prison. *See* N.C.G.S. § 15A-1340.19A (providing that a defendant must "serve a minimum of 25 years [of] imprisonment prior to becoming eligible for parole"). In considering the effect of the imposition of multiple terms of active consecutive sentences upon a juvenile offender, while all of them officially could afford a defendant the possibility of parole, there arrives a point at which the combination of the length of active terms of incarceration—albeit expressly affording the possibility of parole—becomes tantamount to a life sentence without parole for the juvenile offender. This would occur at the juncture when the juvenile offender has been incarcerated for such a protracted period of time that the possibility of parole is

no longer plausible, practical, or available. A juvenile offender's opportunity for parole, in light of the sentencing authority's determination that the defendant is neither incorrigible nor irredeemable but is instead worthy to have a chance for release to parole, must be an opportunity which is realistic, meaningful, and achievable. The opportunity must be implementable, instead of amounting to a mere formal announcement of a juvenile sentence allowing the possibility of parole, but which in reality is illusory and only elevates form over substance. *See, e.g.*, *M.E. v. T.J.*, 2022-NCSC-23 ¶ 1 ("For well over a century, North Carolina courts have abided by the foundational principle that administering equity and justice prohibits the elevation of form over substance.") (first citing *Currie v. Clark*, 90 N.C. 355, 361 (1884) ("This would be to subordinate substance to form and subserve no useful purpose."); then citing *Moring v. Privott*, 146 N.C. 558, 567 (1908) ("Equity disregards mere forms and looks at the substance of things."); and then citing *Fid. & Cas. Co. of N.Y. v. Green*, 200 N.C. 535, 538 (1931) ("To hold otherwise, we apprehend, would be to exalt the form over the substance.")). We do not authorize an empty opportunity for parole which is more akin to a mirage in its attainability than a realistic occasion for a redeemable juvenile to be rehabilitated as contemplated by the Supreme Court of the United States in its series of opinions addressing juvenile punishments which we have cited and applied. *Cf. Shore v. Edmisten*, 290 N.C. 628, 633 (1976) ("In determining whether a given payment is a fine or restitution, the label given by the

judge (or the legislature) is not determinative.").

¶ 48     The implementation of a clear directive establishing the maximum limit of carceral time that may be served by redeemable juvenile offenders before they may have an opportunity to seek parole is venturesome. Any categorical sentencing rule is open to criticism as perhaps too lenient on one hand, in light of the circumstances of the commission of crimes or the characteristics of the victims, or as perhaps too harsh on the other hand given the characteristics of the juvenile offender's life and circumstances. Inherently, all determinations regarding sentencing include some element of the arbitrary: length, type, degree, and the like. Requiring completion of twenty-five years of imprisonment before a redeemable juvenile offender can seek parole following imposition of a single sentence of life with the possibility of parole, which was implemented as a feature of North Carolina's *Miller*-fix statutes, is a convenient and pertinent example of the selection of a period of incarceration which must be served and which was established with some modicum of arbitrariness. This state's Structured Sentencing Act scheme is replete with further illustrations of arbitrarily determined, though reasonably reached, provisions designed to promote fairness in sentencing. *See* N.C.G.S. §§ 15A-1340.10 to -1340.23 (2021).

¶ 49     We recognize and appreciate the direction provided by the Supreme Court of the United States in *Miller* that individualized *sentencing* for juveniles is required. 567 U.S. at 465. We also recognize and appreciate the existing criminal justice

processes in North Carolina for the sentencing of juveniles who have been convicted of first-degree murder which have been established by the General Assembly through statutory enactments and which have been interpreted by this Court through the application of governing state laws and constitutional provisions, as well as the application of the principles enunciated by the United States Supreme Court, to cases which have been decided by this Court. In this regard, our determination of a definitive guideline for the maximum length of incarceration which a juvenile offender can serve before the possibility of parole must be accorded to the young perpetrator sentenced to life with the possibility of parole must adhere to a trial court's ability to determine whether a juvenile offender should be sentenced to life with the possibility of parole or life without the possibility of parole following hearings conducted under the *Miller*-fix statutes, coupled with a trial court's discretion to decree that a juvenile offender's multiple sentences will run concurrently or consecutively pursuant to N.C.G.S. § 15A-1354. Specifically, in a hearing held pursuant to the *Miller*-fix statutes, the State and the juvenile offender may introduce evidence regarding the defendant's past and current circumstances as well as the nature of the crime or crimes for which the defendant is being sentenced, with the trial court being obligated to consider such evidence in determining whether potential parole is appropriate for the individual juvenile offender. All evidence of record, along with other relevant and insightful information, may further inform the trial court's

decision regarding whether multiple sentences should run concurrently or consecutively for a particular defendant being addressed. S*ee, e.g.*, *State v. Arrington*, 371 N.C. 518, 526 (2018) (stating that trial courts are "presumed to know the law") (quoting *Sanders v. Ellington*, 77 N.C. 255, 256 (1877)). This circumstance addresses the aspect of *Miller* which holds that juveniles cannot constitutionally be subject to mandatory life sentences without the possibility of parole. 567 U.S. at 479–80.

¶ 50        Another focus of the reasoning discussed in *Miller* and its lineage of cases is the heightened appropriateness for redeemable juvenile offenders to have the opportunity to demonstrate their readiness for the prospect of parole at a subsequent age of maturity and following some term of incarceration. The time period during which the traditional parole process is nearing for the juvenile offender to become eligible for parole and decide to seek release from incarceration represents a more meaningful and developed juncture for such a parole determination to be made for the juvenile offender by a parole body which is deemed to be suitably tailored, equipped, and empowered to reach an enlightened determination. This approach and eventuality conspicuously comport with the Supreme Court's observations in *Graham* which are cited above.

¶ 51        A proper balance of these considerations compels us to conclude that it is permissible and necessary to establish a specific maximum duration of time for the incarceration of a juvenile offender to serve who was not determined to be incorrigible

or irredeemable, and who was sentenced to life with the possibility of parole, before the defendant is eligible to be considered for parole. While the unique circumstances of each juvenile offender must be individually considered for purposes of sentencing, nonetheless, there must be a commonality of fundamental requirements which uniformly recognizes all of the attendant legal mandates and influences in operation. As such, the establishment of a definitive point at which all redeemable juvenile offenders must be allowed to apply for parole is desirable.

¶ 52    In setting a clear directive for the beginning of parole eligibility for redeemable juveniles who have been convicted of at least one count of first-degree murder, we note that there are a variety of potential ages of defendants or completed terms of incarceration from which to choose. As we delve into this matter, we find it is essential to recognize that in any juvenile prosecution which results in an outcome of multiple convictions and a subsequent sentencing proceeding, the number, as well as the type, of offenses charged and for which a defendant is ultimately convicted impacts the eventual sentences imposed as well as the implementation of the service of those sentences as consecutive or concurrent. Such considerations typically include the additional harms caused to the immediate victims and their family members, in conjunction with the injury inflicted upon society by the commission of multiple offenses. We further acknowledge that some cases are susceptible to convenient inferences which may be drawn regarding a juvenile offender's culpability when an

offender has committed multiple crimes and which may also influence the tenor of the sentences which are administered.

¶ 53     We first address defendant's position that "[t]his Court should set a bright-line rule that no redeemable juvenile may be sentenced to more than twenty-five years in prison before parole eligibility." In support of this tenure of incarceration to be served by a juvenile offender prior to eligibility for parole, defendant cites the language of the *Miller*-fix statutes which provides that "[i]f the sole basis for conviction of a count *or each count* of first[-]degree murder was the felony murder rule, then the court shall sentence the defendant to life imprisonment with parole" and contends that this statutory decree "indicates that our General Assembly has determined parole eligibility at 25 years for multiple offenses sanctionable by life with parole is not so excessive as to run afoul of *Miller*." *State v. Kelliher*, 273 N.C. App. 616, 643 (2020) (quoting N.C.G.S. § 15A-1340.19B(a)(1) (emphasis added), *disc. review allowed*, 376 N.C. 900 (2021)). Defendant asserts that

> [p]arole eligibility after no more than twenty-five years would also be consistent with the lines drawn by other jurisdictions. "[I]n the flurry of legislative action that has taken place in the wake of *Graham* and *Miller*, many of the new statutes have allowed parole eligibility for juveniles sentenced to long prison terms for homicides to begin after fifteen or twenty-five years of incarceration." *Null*, 836 N.W.2d at 72, 72 n.8 (collecting statutes). Moreover, the United States Supreme Court specifically pointed to Wyoming's statute providing parole eligibility after twenty-five years as an appropriate means of complying with *Miller*. *Montgomery*, 193 L. Ed. 2d at 622

(citing Wyo. Stat. Ann. §6-10-301(c) (2013)). Virginia just recently established parole eligibility after only twenty years for every offender under eighteen who is convicted of "a single felony offense or multiple felony offenses." Va. Code Ann. §53.1-165.1. (2020).

Defendant also cites the Model Penal Code, which recommends that for offenders under age eighteen, "[n]o sentence of imprisonment longer than [25] years may be imposed for any offense *or combination of offenses.*" Model Penal Code: Sentencing § 6.11A(g) (Am. L. Inst., Proposed Final Draft Apr. 10, 2017) (emphasis added). For offenders who, like defendant, are under the age of sixteen when they committed their crimes, the Model Penal Code recommends "no sentence of imprisonment longer than [20] years." *Id.*

¶ 54        In evaluating defendant's argument based upon these instructive authorities, this Court must balance the tensions between the guidance from the decisions of the Supreme Court of the United States that parole eligibility should be set at a point sufficiently far in the future to provide a redeemable juvenile offender enough time to mature, rehabilitate, and develop a record which would enable the defendant to show a parole authority that he or she should be released, but yet sufficiently early enough in the defendant's life to enable the juvenile offender to experience worthwhile undertakings outside of prison in the event that parole is granted. We must also give due weight to the General Assembly's enactment of N.C.G.S. § 15A-1354, which unequivocally gives trial courts the discretion to decide whether multiple

sentences should run concurrently or consecutively. *See* N.C.G.S. § 15A-1354(a) ("When multiple sentences of imprisonment are imposed on a person at the same time . . . the sentences may run either concurrently or consecutively, as determined by the court.").

¶ 55        To set parole eligibility for all juvenile offenders at a maximum of twenty-five years would negate the full discretion delegated to trial courts by the General Assembly in N.C.G.S. § 15A-1354(a) to choose between the imposition of multiple sentences in a concurrent or consecutive manner, because it would require that all redeemable juvenile offenders would thus be eligible for parole after serving the statutory minimum term of incarceration before parole eligibility that applies upon a single conviction of first-degree murder standing alone, even where theoretically a redeemable juvenile offender has been convicted of multiple counts of first-degree murder or where, as in the actual case at bar, a redeemable juvenile offender has been convicted of one or more other offenses in addition to one count of first-degree murder. Therefore, we decline to adopt defendant's view that twenty-five years should be the clear directive which this Court establishes as the maximum duration of penal time to be served by a redeemable juvenile offender prior to eligibility for parole. We also decline to hold that the Constitutions of the United States and North Carolina require that, where a redeemable juvenile is convicted of multiple counts of first-degree murder or a single count of first-degree murder plus one or more lesser

offenses, the trial court must order the resulting sentences to run concurrently. The

implementation of any of these available options would have the effect of rendering

N.C.G.S. § 15A-1354 meaningless for redeemable juvenile offenders who have been

convicted of multiple counts of first-degree murder or convicted of a single count of

first-degree murder along with other lesser offenses.

¶ 56    We next consider the State's proposal as to the moment in time to mark the

establishment of a juvenile offender's eligibility for parole, whether upon the

completion of a specific amount of incarceration, the juvenile offender's attainment of

a certain age, or some other criteria.[15] Much of the State's argument focuses on the

assertion that

> *Graham* simply says the states must "give
> defendants like *Graham* . . . some meaningful opportunity
> to obtain release based on demonstrated maturity and
> rehabilitation." *Graham*, 560 U.S. at 75. . . . [but also
> emphasizes] that the states are "not required to guarantee
> eventual freedom to a juvenile offender convicted of a
> nonhomicide crime." *Id.* The Eighth Amendment simply
> prohibits states from making that determination at the
> outset. *Id.* As such, there is no guarantee in *Graham* that
> a juvenile offender will eventually be released, reenter
> society, and have a career, spouse, and/or family.

---

[15] The State's stance as discussed here is its submission of an alternative argument, because the State's primary position is that "[n]either *Graham*, *Miller*, nor [their] progeny have considered or addressed aggregate sentencing for multiple criminal offenses; rather, those decisions narrowly focused on a single sentence arising out of a single conviction and have no application here." First and foremost, the State views as mere dicta the language from those cases upon which we have relied for our conclusion regarding the unconstitutional creation of de facto life without parole sentences for redeemable juveniles.

We fully agree with the State's interpretation of this segment of *Graham* that redeemable juvenile offenders are not *entitled* to release during their life sentences. Nonetheless, as discussed above, such juvenile offenders are entitled to have the opportunity to *seek* parole by demonstrating that their crimes were the result of "transient immaturity," that they have matured since the perpetration of their crimes and have redeemed themselves, and that they are worthy of release from prison and reentry into society. *See Montgomery*, 577 U.S. at 208.

¶ 57     Beyond its argument that defendant's forty-five-year minimum term of imprisonment before becoming eligible for parole is not a de facto life without parole sentence, the State does not expressly endorse a specific maximum term of incarceration that a juvenile offender can serve before possessing an opportunity to seek parole. However, the State cites cases from other jurisdictions which have held that "to be released in his or her late sixties or early seventies satisf[ies] the 'meaningful opportunity' requirement. . . . because in today's society, it is not unusual for people to work well into their seventies and have a meaningful life well beyond age 62 or even at age 77." *State v. Smith*, 892 N.W.2d 52, 65–66 (Neb. 2017) (opining that parole eligibility at age sixty-two cannot be considered "a 'geriatric release'" and does not "equate[ ] to 'no chance for fulfillment outside prison walls'"), *cert. denied*, 138 S. Ct. 315 (2017). While we agree that some people thankfully are able to enjoy rewarding lives as they achieve chronological ages reaching into their sixties,

seventies, and beyond, we find this prospect to be loftily optimistic when applied to the category of individuals who have spent several decades in prison.

¶ 58        Noting that "[m]any courts have concluded that a sentence of a term of years that precludes parole consideration for a half century or more is equivalent to a sentence of life without parole," *Carter v. State*, 192 A.3d 695, 728 (Md. 2018), we do not regard a custodial period of fifty years or more prior to a juvenile offender's eligibility for parole to constitute a meaningful opportunity for a defendant to seek release, given that most juvenile offenders will not achieve such longevity. *See, e.g.*, ACLU of Mich. Juv. Life Without Parole Initiative, Michigan Life Expectancy Data for Youth Serving Natural Life Sentences 2 (visited on 03/17/2017) (reporting that the average life expectancy for juvenile offenders who received natural life sentences was 50.6 years), http://www.lb7.uscourts.gov/documents/17-12441.pdf; U.S. Sent'g Comm'n, Life Sentences in the Federal System 10, 23 n. 52 (Feb. 2015) (defining a de facto life sentence as beginning at 470 months—39 years and two months—because such a sentence is "consistent with the average life expectancy of federal criminal offenders")      https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf. Considered in this framework, this Court's establishment of a term of fifty years as the maximum amount of carceral time that a juvenile offender must serve before obtaining the opportunity to demonstrate to a parole authority the defendant's

worthiness of release would, for the proven majority of these defendants, amount to the same illusion which spawns the determination that de facto life sentences for redeemable juvenile offenders constitute cruel or unusual punishment or both. Under a fifty-year threshold of incarceration before the arrival of parole eligibility, most juvenile offenders in North Carolina who were granted the possibility of parole at their sentencing hearings would die in prison before ever having the anticipated chance of one day showing that they are worthy of release.

¶ 59        Instead, this Court draws from the above-referenced resource, the United States Sentencing Commission, and its instructive guidance regarding the determination of a de facto life sentence. Equipped with such a helpful tool of reference, this Court establishes the quantum of forty years of incarceration as the point in time at which a juvenile offender who has not been deemed to be incorrigible or irredeemable by a trial court, and who is serving a sentence of life imprisonment with the possibility of parole, is eligible to seek release pursuant to parole provisions. This outcome respects both the discretion of trial courts to statutorily elect to order multiple sentences for a juvenile offender to run either concurrently or consecutively *and* the constitutional rights of those juvenile offenders who trial courts determine are eligible to be considered for parole despite the imposition of a life sentence to evade cruel and unusual punishment through the establishment of a reasonable maximum duration of incarceration prior to a juvenile offender's eligibility for parole.

This conclusion does not require the allowance of parole for any particular juvenile offender after forty years, nor does this conclusion guarantee the release of any of these defendants at any age. This conclusion merely eliminates the creation of an unconstitutional de facto life without the possibility of parole sentence for a redeemable juvenile offender who was given a life with the possibility of parole sentence, and does so by instituting a uniform and ascertainable juncture which is reasonably calculated and which is reasonably achievable by redeemable juvenile offenders. Conversely, this determination mandates that criminal offenders who perpetrate their offenses as juveniles and who receive sentences which permit parole must, after forty years of incarceration, *have the opportunity* to demonstrate their worthiness of release.

¶ 60        The recognition of a forty-year term of incarceration as a reasonable maximum duration of imprisonment to be served by a juvenile offender who has not been deemed by a trial court to be incorrigible or irredeemable, and who is serving a sentence of life imprisonment with the possibility of parole, is an appropriate length of incarceration prior to parole eligibility which affords such a defendant with a realistic, meaningful, and achievable opportunity for release to parole, while simultaneously setting parole eligibility far enough in the juvenile offender's future to allow the defendant adequate time to mature, rehabilitate, and develop a record upon which to show a potential readiness for parole. Such considerations are

consistent with the prohibition of the infliction of "cruel *and* unusual punishments" addressed in the Eighth Amendment to the United States Constitution and the prohibition of the infliction of "cruel *or* unusual punishments" mentioned in article I, section 27 of the Constitution of North Carolina. The forty-year determination is also authorized and fortified by article I, section 1 of this state's constitution which identifies "certain inalienable rights" of "all persons," including "life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." Despite their violations of criminal law, juvenile offenders who are deemed by the trial courts of North Carolina to be eligible for parole after these defendants' respective terms of incarceration are still regarded to be worthy of a chance to work themselves back into positions in the free society to potentially experience fulfilling undertakings outside of prison in the event that parole is granted.

¶ 61        In assessing defendant's "meaningful opportunity to obtain release" in the present case—as the phrase was utilized by the Supreme Court of the United States in its decision in *Graham v. Florida*, 560 U.S. at 123—it is enlightening to view the operation of the identified forty-year term of incarceration to be served prior to his eligibility for parole. Defendant was fifteen years and six months of age at the time that he perpetrated the offenses for which he is incarcerated. He received an aggregate minimum sentence of forty-five years of imprisonment before he is positioned to be considered for parole. Consequently, defendant would be sixty years

of age at the time that he initially becomes eligible to seek parole. According to the mortality tables which are embodied in North Carolina General Statutes Section 8-46, a person who has completed the age of fifteen years is expected to live for an additional 61.7 years. Since this juvenile offender in the instant case had completed the age of fifteen years at the time of the commission of his criminal offenses which has resulted in his ongoing imprisonment, he has a projected life expectancy pursuant to North Carolina law of 76.7 years. Adding the age of defendant at the time that his incarceration began—fifteen years, six months—to an active sentence of forty years to be served in custody prior to eligibility for parole—the *earliest* opportunity that the juvenile offender would be eligible for release from prison would be upon his attainment of the age of fifty-five years and six months. Furthermore, the expected amount of remaining life expectancy which defendant would possess after his earliest possible release from prison to parole would be 21.1 years of life, according to the mortality tables of this state.

¶ 62      Defendant's sentencing circumstances in the instant case are remarkably similar to those which existed for the defendant in the Michigan case of *Kitchen v. Whitman*, 486 F. Supp. 3d 1114 (2020). The defendant Kitchen, who committed a series of criminal offenses at the age of seventeen years, was sentenced to a minimum of forty-two years of incarceration by a state trial court. Defendant challenged his sentence under the Eighth Amendment to the United States Constitution, the

corresponding provision of the Michigan Constitution, the Equal Protection Clause, and the Due Process Clause. In ultimately deciding to appoint new counsel to represent defendant in the proceedings, the federal district court consulted life expectancy tables in evaluating the defendant's claims under *Miller*, *Graham*, and other cases and determined that the defendant Kitchen's life expectancy was seventy-seven years, virtually identical to defendant's life expectancy here of 76.7 years pursuant to the North Carolina mortality tables; that the defendant "Kitchen's first parole review is at age 59," 486 F. Supp. 3d at 1128, akin to the present defendant's age of fifty-five years and six months when parole eligibility arose; and that defendant Kitchen's "opportunity for release would come 18 years before he is expected to die," *id.*, close to the current defendant's 21.1 more projected years of life after his potential release from prison to parole. In light of these circumstances in the case of defendant Kitchen, the federal district court noted these milestones of time in stating: "That would be a 'meaningful opportunity' even under a reading of *Graham* that includes time to reintegrate into society." *Id.* Since the salient circumstances of defendant in the present case are commensurate with the same circumstances of defendant Kitchen in the Michigan case regarding the evaluative measures of the two juvenile offenders' relative ages when these defendants committed their respective crimes, their respective life expectancies, their relative ages at the times of their respective opportunities for parole eligibility, and their relative projected remaining life spans

in the event that these defendants would obtain parole in their first efforts, the defendant Kitchen's forty-two-year term of incarceration prior to parole eligibility is sufficiently compatible with defendant's maximum forty-year term of incarceration prior to parole eligibility in order to further substantiate the identification of a forty-year term of incarceration as a reasonable maximum duration of imprisonment to be served by a juvenile offender who has not been deemed by a trial court to be incorrigible or irredeemable, and who is serving a sentence of life imprisonment with the possibility of parole.

¶ 63 The dissent misguidedly conflates our installation of a juvenile offender's realistic opportunity to obtain parole eligibility when given a life with the possibility of parole sentence as a component of consecutive sentences for the commission of multiple crimes with the dissent's misapprehension that we have determined that a violent juvenile offender shall obtain mandatory parole eligibility. Regrettably, the dissent further obfuscates our decision by spouting that we have declared that mandatory parole eligibility is established by the United States Constitution and the North Carolina Constitution, when in reality we have cited and followed the opinions of the Supreme Court of the United States which itself has linked a juvenile offender's "realistic opportunity to obtain release before the end of" a term of a life sentence to constitutional protections. This alarming confusion exhibited by the dissent regarding our adherence to the precedent of the Supreme Court is heightened by the

dissent's failure to capably distinguish our obligation to follow the edicts of our nation's highest court from the dissent's own unsubstantiated pronouncement that somehow our decision is based on the dissent's projection upon us of some desired policy, rather than on existing appellate case law precedent. Although the dissent boldly intones its incredulity that we have implemented the principles articulated by the Supreme Court of the United States concerning this area of juvenile sentencing, and while the dissent bluntly expresses its exasperation that we have preserved constitutional protections for juvenile offenders in a manner consistent with governing appellate case law, nonetheless we have striven to continue this Court's respected and revered approach to attempt to achieve the best resolution of challenging cases of first impression in North Carolina without resort to collateral clatter.

## III. Conclusion

¶ 64        By virtue of the trial court's judgment in the juvenile's case, defendant here was expressly determined to be included in the category of juvenile offenders who should retain the opportunity to seek parole, despite his convictions for the offenses of first-degree murder and first-degree rape. After serving forty years of incarceration for these crimes pursuant to the implementation of consecutive sentences, defendant possesses the opportunity to be considered for parole. To compel defendant to serve a term of incarceration in excess of forty years upon the trial court's determination that

defendant, in light of his status as a juvenile, is neither incorrigible nor irredeemable, would unconstitutionally constitute a de facto life sentence. Accordingly, we reverse the decision of the Court of Appeals as to the appealable issue before us. The remaining issues addressed by the Court of Appeals are not properly before this Court and its decision as to these issues remains undisturbed. We remand this case to the Court of Appeals for further remand to the trial court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice BERGER dissenting.

While the Supreme Court has determined that "sentencing an offender who was under 18 at the time of the crime raises special constitutional considerations," *Jones v. Mississippi*, 141 S. Ct. 1307, 1314, 209 L. Ed. 2d 390, 399 (2021), it has never held that the Eighth Amendment prohibits consecutive sentences for multiple crimes or guarantees release of a juvenile offender convicted of violent felonies. *See Graham v. Florida.*, 560 U.S. 48, 75, 130 S. Ct. 2011, 2030, 176 L. Ed. 2d 825, 845 (2010) ("A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.") The majority, however, inserts mandatory parole eligibility after forty years for violent juveniles convicted of multiple crimes into our State's structured sentencing scheme. According to the majority, mandatory parole eligibility for juveniles convicted of multiple violent offenses can be found in the state and Federal Constitutions. I respectfully dissent.

## I. Factual and Procedural Background

On March 11, 2016, defendant brutally raped Felicia Porter and beat her to death with a shovel. Defendant broke her arm and nearly every bone in her face. Her front teeth were knocked out. Defendant was questioned by law enforcement multiple times and provided a myriad of lies while attempting to conceal his involvement in Felicia's murder.[1]

---

[1] Defendant identified one of his friends as the culprit. The factual recitation during defendant's plea proceeding indicates that defendant at one point told officers that he went to Ms. Porter's with Brad Adams. According to defendant, Mr. Adams hit Ms. Porter with a

¶ 67    Upon his plea of guilty, defendant was sentenced to consecutive terms of imprisonment of 240 to 348 months in prison for first degree forcible rape and "a minimum of 25 years" for murder. *See* N.C.G.S. §§ 15A-1340.19A and 15A-1354(a) (2021). Pursuant to the trial court's judgment, defendant would be eligible for parole after forty-five years in prison, when he would be sixty years old.

¶ 68    Defendant appealed to the Court of Appeals, arguing that consecutive sentences are impermissible under the *Miller*-fix statutes, and that the sentences violated the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution because the sentences operated as the functional equivalent of life without parole.[2]

¶ 69    In a split decision, the Court of Appeals majority determined that trial courts may impose consecutive sentences under N.C.G.S. § 15A-1340.19A. In addition, the Court of Appeals majority concluded that defendant was eligible for parole when he is sixty years old, and, therefore, the forty-five-year sentence did not amount to de facto life in prison given his life expectancy. *State v. Conner*, 275 N.C. App. 758, 760, 853 S.E.2d 824, 825 (2020).

---

brick and raped her. Because of defendant's fabricated story, Mr. Adams had to provide a DNA sample and alibi to clear himself of defendant's accusations. The DNA sample obtained by law enforcement and video surveillance images from a local business exonerated Mr. Adams.

[2] Defendant also argued that the trial court erred in imposing lifetime SBM. This issue is not before the Court.

¶ 70        Although in agreement that consecutive sentences are not prohibited by N.C.G.S. §§ 15A-1340.19A to 15A-1340.19D, the dissenting judge nonetheless would have found that defendant's forty-five-year sentence amounted to a de facto sentence of life without parole and is, therefore, unconstitutional.  The dissent further reasoned that defendant's possible "geriatric release . . . does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*."  *Id.* at 777, 853 S.E.2d at 835 (McGee, C.J., concurring in part and dissenting in part) (alteration in original) (quoting *State v. Null*, 836 N.W. 2d 41, 71 (Iowa 2013)).  Instead, the dissenting judge suggested that a defendant is owed "more than the mere act of release or a de minimis quantum of time outside of prison."  *Id.* at 777, 853 S.E.2d at 835 (cleaned up).

¶ 71        On appeal to this Court, defendant contends that precluding parole eligibility until the age of sixty amounts to a sentence of life without parole and thus is violative of the state and Federal Constitutions.

## II.    Discussion

¶ 72        "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const., amend. VIII.  Similarly, the North Carolina constitution prohibits "cruel or unusual punishments."  N.C. Const. art. I, § 27. (Emphasis added).  As noted by Chief Justice Newby in his dissent in *State v. Kelliher*, Article XI provides clarification as to the meaning of "cruel or unusual

punishments" in Article I, § 27. *State v. Kelliher*, 2022-N.C.-77, ¶ 118 (2022) (Newby, C.J., dissenting). Specifically, permissible criminal punishments in North Carolina are restricted to those listed in Article XI, which include that of "death" and "imprisonment." N.C. Const. art. XI, § 1. Given that these particular punishments are expressly authorized by our constitution, they cannot be "'cruel or unusual' within the prohibition of Article I, Section 27. John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 84 (2d ed. 2013).

¶ 73        Providing further instruction, Article XI, Section 2 limits the use of the punishment of death to "murder, arson, burglary, and rape . . . if the General Assembly shall so enact." N.C. Const. art. XI, § 2. Accordingly, the power to determine the appropriate punishment for crimes, even the most severe, is constitutionally, and solely, granted to the legislature. It is not a power this Court possesses.

¶ 74        Nonetheless, "this Court historically has analyzed cruel and/or unusual punishment claims by criminal defendants the same under both the federal and state Constitutions," despite the variation in the disjunctives. *State v. Green*, 348 N.C. 588, 603, 502 S.E.2d 819, 828 (1998). Further,

> [w]hether the word "unusual" has any qualitative meaning
> different from "cruel" is not clear. On the few occasions this
> Court has had to consider the meaning of the phrase,
> precise distinctions between cruelty and unusualness do
> not seem to have been drawn. These cases indicate that the
> Court simply examines the particular punishment involved

> in light of the basic prohibition against inhuman
> treatment, without regard to any subtleties of meaning
> that might be latent in the word "unusual."

*Id.* at 603, 502 S.E.2d at 828 (quoting *Trop v. Dulles,* 356 U.S. 86, 100 n.32, 78 S. Ct. 590, 598 n.32, 2 L. Ed.2d 630, 642 n.32 (1958)).

¶ 75     The Supreme Court has had many opportunities in recent years to examine juvenile sentencing in light of the Eighth Amendment. In *Roper v. Simmons*, the Supreme Court held that the Eighth Amendment prohibits the death penalty for murderers under the age of eighteen. 543 U.S. 551, 578, 125 S. Ct. 1183, 1200, 161 L. Ed. 2d 1, 28 (2005). In *Graham*, the Supreme Court outlawed imposition of life without parole sentences for juveniles convicted of nonhomicide crime. 560 U.S. at 82, 130 S. Ct. at 2034, 176 L. Ed. 2d at 850. In *Miller v. Alabama*, mandatory life without parole was determined to be a permissible sentence under the Eighth Amendment for juveniles convicted of homicide provided that the trial court has discretion to impose a different punishment. 567 U.S. 460, 483, 132 S. Ct. 2453, 2471, 183 L. Ed. 2d 407, 430 (2012). *Miller* was made retroactive through the Supreme Court's opinion in *Montgomery v. Louisiana*, 577 U.S. 190, 136 S. Ct. 718, 193 L. Ed. 2d. 599 (2016). Most recently, the Supreme Court expressly stated that a state court need not find "permanent incorrigibility" to sentence a defendant under the age of eighteen to life in prison without parole. See *Jones*, 141 S. Ct. at 1318, 209 L. Ed. 2d at 404 (2021) (determining that defendant's "argument for requiring a finding of

permanent incorrigibility is unavailing because *Montgomery* explicitly stated that '*Miller* did not impose a formal factfinding requirement' and that 'a finding of fact regarding a child's incorrigibility . . . is not required.' ") (alteration in original) (quoting *Montgomery*, 577 U,S, at 211, 136 S.Ct. at 735, 193 L.Ed. 2d. at 599).

¶ 76        Because "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845, defendant's consecutive sentences resulting in parole eligibility do not run afoul of the Eighth Amendment or our traditional approach under Article I, Section 27 of the North Carolina Constitution. It seems unusual then that the majority would conclude that defendant's possible sentence of forty-five years with parole is constitutionally suspect, especially since defendant committed two separate violent crimes — homicide and rape.

¶ 77        Even if, as the majority contends, defendant falls into the category of offenders addressed in *Graham*, i.e., defendants sentenced to life without parole for a nonhomicide crime, the sentence imposed by the trial court is permissible. In *Graham*, the defendant received a sentence of life without parole for armed burglary, and a concurrent sentence of fifteen years for attempted robbery. *Id.* at 57, 130 S. Ct. at 2020, 176 L. Ed. 2d at 834. The Supreme Court noted that the State need only provide "defendants like Graham some meaningful *opportunity to obtain release* based on demonstrated maturity and rehabilitation." *Id.* at 75, 130 S. Ct. at 2030,

176 L. Ed. 2d at 845-46 (emphasis added). Accordingly, there is no requirement in *Graham* that a juvenile convicted of multiple violent crimes, including homicide, be guaranteed release.

¶ 78 The majority, however, expands straightforward language from an "opportunity to obtain release" to an "opportunity to seek parole . . . early enough in the defendant's life such that he can experience a meaningful life outside of prison." This constitutional evolution is based solely on the majority's desired policy preferences.

¶ 79 "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. This Court has repeatedly stated that it is solely for the legislature to determine the appropriate punishment for individuals convicted of crime. *See State v. Gardner*, 315 N.C. 444, 453, 340 S.E.2d 701, 708 (1986) ("[T]he substantive power to prescribe crimes and determine punishments is vested with the legislature . . . .") (quoting *Ohio v. Johnson,* 467 U.S. 493, 499, 104 S. Ct. 2536, 2541, 81 L. Ed. 2d 425, 433 (1984)); see also, *Green*, 348 N.C. at 605, 502 S.E.2d at 829 ("[I]t is the role of the legislature and not the courts to decide the proper punishment for individuals convicted of a crime."); *State v. Cradle*, 281 N.C. 198, 209, 188 S.E.2d 296, 303 (1972) ("It is within the province of the General Assembly of North Carolina and not the judiciary to determine the extent of punishment which may be imposed on those

convicted of crime. If the sentence pronounced here seems harsh, the executive branch of government acting through the Board of Paroles may lawfully commute it.").

¶ 80          Nonetheless, the majority darts into the legislative lane, usurping legislative authority by enacting its new law simply because they find this result "desirable" for violent juveniles. The majority's judicial sentencing scheme which introduces de facto life in prison and implements mandatory parole eligibility after forty years in prison is supposedly "mandate[d]" by the state and Federal constitutions. But one toils to locate this fiction in the text of either document or precedent. The majority even admits that they are "challenged" by their trespass into legislative drafting, lamenting the difficulty of the task they have chosen to undertake. But unlike the legislature, the majority creates their new law with no input from justice system stakeholders – save defendant's attorney and a host of ideologically aligned amici.[3]

¶ 81          Equally troubling is what the majority fails to address. There is no direction to the trial courts and prosecutors on how to properly handle violent juvenile offenders who commit multiple violent crimes on multiple days. If these violent

---

[3] As Justice Scalia famously noted, "The problem with a living Constitution in a word is that somebody has to decide how it grows and when it is that new rights are — you know — come forth. And that's an enormous responsibility in a democracy to place upon nine lawyers, or even 30 lawyers." Bruce Allen Murphy, *Justice Antonin Scalia and the 'Dead' Constitution,* N.Y. TIMES (Feb. 14, 2016), http://nytimes.com/2016/02/15/opinion/justice-antonin-scalia-and-the-dead-constituion.html.

offenders are tried, convicted, and sentenced at separate sessions of superior court, does the de facto life sentence and mandatory forty-year parole eligibility rationale apply such that they receive a "volume discount"? *State v. Soto-Fong*, 250 Ariz. 1, 8, 474 P.3d 34, 41 (2020) (citation omitted). "[G]enerally, courts do not permit defendants to 'stack' their crimes to generate an Eighth Amendment claim," *id.* at 8, 474 P.3d at 41, but violent juvenile crime sprees may yield a different result in North Carolina under the majority's reasoning.

¶ 82     Here the trial court appropriately considered defendant's individual circumstances in sentencing him to consecutive terms of imprisonment. The trial court, in its discretion, determined that imposition of consecutive sentences was appropriate for this defendant. The resulting sentences imposed are not in conflict with the U.S. Constitution, Supreme Court precedent, or the law of this State and should be upheld.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.